The next case this morning is 20-4025, Estate of Madison Jody Jensen v. Tubbs. Counsel, please prepare to argue. Right. Counsel, if you will please, to the best of your ability, refrain from a repetition, please. Thank you, Your Honor. Your Honor, my name is Courtney Cote Sheever, and I have the pleasure of representing Dr. Kenan Tubbs in this matter. I would like to reserve four minutes for rebuttal, if that's possible. In order to refrain from duplicating any facts, Your Honor, I'd like to just start simply with Duchesne County Jail is a rural jail in eastern Utah. They contracted with Dr. Kenan Tubbs to assist in providing medical care to the inmates at that jail. As part of that contract, Dr. Tubbs was supposed to be or have someone at the jail once a week to provide clinic. He was there to provide call 24-7 and providing training and supervision to the jail's single LPN, Jana Clyde. Dr. Tubbs then contracted with P.A. Clark to assist with the weekly call at the Duchesne County Jail. It is undisputed that Dr. Tubbs or P.A. Clark provided those weekly visits, and that during those weekly visits, they provided instruction to Jana Clyde. Now, when Ms. Jensen arrived to the Duchesne County Jail and throughout her stay, it is also undisputed that Dr. Tubbs was at no time contacted by jail staff or Nurse Clyde regarding any of Ms. Jensen's health concerns. And in fact, Dr. Tubbs was not informed of her death until after it occurred. Significantly, as Your Honors have already pointed out, this was the first death of heroin withdrawal that Dr. Tubbs had encountered specifically at this facility, but also within 19 years of experience within the correctional system. In this case, why was it not deliberately indifferent to just have a policy of providing training to Nurse Clyde, LPN Clyde, on a sort of one-off basis when somebody would come every week? I mean, given the potential for serious situations that would occur at the facility, why isn't that deliberately indifferent? So, it's not deliberately indifferent, Your Honor, because this training was provided one-on-one on a weekly basis. And in fact, as the only medical provider who is stationed at the jail, this one-on-one training was probably the most efficient way to provide training to this LPN. Not only that, but the LPN comes with training. Although she is not able to assess or diagnose, an LPN has a background in health and providing health care. That is an issue that was addressed in the Connick v. Thompson case before the U.S. Supreme Court. Well, did you provide her with a protocol as to what to do if there were dehydration? It is undisputed that everyone at the jail knew that if they had any health concerns, any concerns for any inmates, they were to call Dr. Tubbs or PA Clark, and they could do so 24-7. Speaking of undisputed facts, let me just make clear what your position is on this. The district court's analysis here, in my view, was less than optimal in the way it went about this. I think you pointed this out as well in your brief, in the sense that the court relied on genuine disputes of material fact, when essentially what it was supposed to be doing was applying the law to an established set of facts. That established set of facts was plaintiff's version of the facts as supported by the record. I want to be clear, because if they're factual disputes, if that's what we're talking about, we don't have jurisdiction over this appeal. So you're willing to accept plaintiff's version of the facts as supported by the record for purposes of this appeal. Is that correct? That's correct. Okay. So given those set of facts, we believe that, in fact, the district court erred by not granting Dr. Keenan Tubbs' motion for summary judgment based upon qualified immunity. Not only is Dr. Tubbs eligible for qualified immunity as a private physician who contracts to provide medical care at the jail, but also plaintiff has not and cannot establish that Madison Jensen's clearly established constitutional rights were violated. Dr. Tubbs had the same sort of contract with nine facilities, did he not, or something like that? Nine counties at the same time? With multiple facilities, yes. Multiple facilities. Well, why wouldn't he be subject to the same sort of competitive commercial pressures that were talked about in Richardson? That's, I think it's Richard or Richardson, such that he would not need qualified immunity. I mean, why is it self-evident that qualified immunity is appropriate for him, given that he's got a large-scale practice there of doing exactly this across multiple counties? The reason why, Your Honor, is in Richardson and all the other cases that plaintiff cites to, we're dealing with large companies. This is an individual doctor who is providing services at a small jail. Well, he's not just doing it at that jail. That's the predicate of my question. The question is, he's doing it in multiple jails. So he's got a business. He's got a nice little business model there of serving his doctor for multiple counties. And so why is he any different than Jensen versus Lane County, where you've got a privately organized group of psychiatrists providing services to the government? What's the distinction? I'm sorry, what case did you just refer to, Your Honor? If you don't know, Jensen versus Lane County, Ninth Circuit case. Thank you. No, Your Honor, in this case, I think the distinction is, is once again, this is a single physician, that they don't have the kind of benefits or other protections that are afforded by companies or even groups of physicians in providing care and treatment to these facilities. Would he have malpractice coverage? He did have malpractice coverage, but Your Honor, you cannot get malpractice coverage to cover 1983 actions. And so those kinds of situations, a single physician is at the mercy of a county and whether or not they agree to defend an individual physician like Dr. Tubbs cannot contract that. So Your Honor, as we look to, as you've already gotten into, when we look to qualified immunity and whether an individual physician is eligible to receive qualified immunity, Solarski and Richardson make it obvious that this is an analysis that takes place not only by looking at history, but looking at the purposes of qualified immunity. When we talk about the purposes of qualified immunity, we have the aspects that the court points out are unwarranted timidity, which Richardson indicates is the most important special government immunity producing concern. The next one that we talk about is that we need to attract talented candidates to government service. And Solarski recognized that when private individuals contract with government, but then they are left holding the bag for liability, but the rest of the team that they is also an aspect that Justice Sotomayor pointed out specifically in her concurrence, where she says there's a real risk that the individual will be intimidated from performing his duties fully if he alone may bear the price of liability for collective conduct, which is exactly the case we have here. Plaintiff brought a cause of action for supervisory liability, not only against Dr. Tubbs, but also against the sheriff, and brought 1983 actions against all of the prison guards who had interactions with Ms. Jensen, as well as Janet Clyde. But at the end of the day, everyone but Dr. Tubbs and Janet Clyde were given qualified immunity. When Dr. Tubbs worked with each one of those individuals, and each one of those individuals were aware that they could call Dr. Tubbs 24-7 if they had any concerns about an inmate's health or treatment. Furthermore, Dr. Tubbs did not have the ability to hire or fire any individuals at the jail. And so in doing, he was inserted himself into a team. And then he, however, if he is not given qualified immunity, is left alone to hold liability at the end of the day, if everyone else is given qualified immunity. And by that, he didn't have the authority to fire Clyde. He did not. He also did not have the ability to hire her. Furthermore, courts would like to make sure that lawsuits do not distract from the duties of care and treatment or of governmental duties. Of course, all of these things are public policy issues that courts address when asserting whether or not they grant qualified immunity. Now plaintiff, however, would like this court to focus solely upon the common law. But because and find just because the defendant is a private entity, and is a physician, that the common law does not afford physicians qualified immunity. Well, of course, Richardson found, first of all, that physicians had enjoyed qualified immunity. And Richardson and Filarski make it very obvious that this is not a single prong analysis. But this is a case by case analysis that takes place in every case. And when we look at this case, it is in fact very similar to Filarski, where the government employed an attorney. Now, the attorney was not advocating for the government. The attorney was performing an investigation as part of a team. Now, when that attorney was sued as part of that invest, as a result of that investigation, and all of the other parties receive qualified immunity, that attorney was left alone holding the bag. What did Tubbs know? And when did he know it? Dr. Tubbs did not know anything about Ms. Jensen's care and treatment while she was at the facility. He only found out about her death after it occurred. So this is on his part, purely a supervisory claim? Completely. And plaintiff has, excuse me, did I interrupt? No, I said thank you. So, we're old-fashioned. I appreciate it. Thank you, Your Honor. So, it's our contention, first of all, that Dr. Tubbs is contracted with a small rural jail to provide medical services. Now, if that's a fact, plaintiff then has the heavy burden of establishing that Dr. Tubbs violated a clearly established right. Now, plaintiff has not met this heavy burden by any measure. First of all, plaintiff has failed to articulate a particular constitutional right. I suppose your argument would be that even if we don't give your client qualified immunity, that he still is free of liability because his supervisory obligation, A, did not exist, or B, was not within the scope of the supervision of this particular practitioner. Well, in this instance... In other words, we deny... Let me put the question differently. If we deny your argument on qualified immunity, then what is your remaining defense on the complaint? That Dr. Tubbs fulfilled his obligations when it came to his duty to train and, in fact, was not contacted. And had he been contacted as had been the custom and practice at this jail, then he could have intervened. But... The only question here, right, is whether you are entitled to qualified immunity. And I mean, both as an eligible for it and then entitled to it. If we were to hold that you are not eligible for it, then it's game over, isn't it? I mean, your conduct or lack of conduct for purposes of this appeal, it's game over because you can't assert qualified immunity. That's true, your honor. And your honor, I'm short on time if I can reserve. All right. Unless I can ask or ask it... No, no, no. It's reserved. Let's... Thank you. May it please the court. Ryan Hansey again for the estate of Madison Jensen. So, the threshold issue here is, in fact, whether or not Dr. Tubbs is eligible for qualified immunity. This circuit has not yet decided that. For somebody similarly situated to Dr. Tubbs, I think that there's a case currently pending before the circuit called Tanner out of the District of New Mexico, but it has not been decided yet. And so it's an open question. But I think that here the best case for the court to consider is the Sixth Circuit case of Tepe, which we briefed. And that... Is Tanner a private physician in a rural setting? It's a private physician or a psychologist. I can't remember which, but yes, it is. It's a similarly situated person. And here's why I like Tepe, because Tepe comes after Richardson-Falarski, and it does a deep dive analysis of the Supreme Court's way of analyzing this particular issue. And so it goes... It starts with the threshold question, what does the Supreme Court say we have to look at to determine whether or not qualified immunity should extend to a private person? And the first prong of that analysis is, let's look back at whether immunities were given to similarly situated people at the time that Section 1983 was enacted. Because if no such immunities existed there, then we don't need to assume that Congress was trying to abrogate it in that code section. And secondly, let's look at the policies, the public policies behind qualified immunity. We don't want to discourage candidates or applicants from applying for these jobs. We don't want to distract them from their cases that existed back in that timeframe. They did a very thorough analysis and they determined after looking at all of that, that not only did immunities not exist for private physicians working in private practice or for public facilities, but they didn't exist for public physicians working for public facilities. And then it went on and it analyzed the public policy factors. And it said the same thing that Judge Holmes alluded to earlier, these people can afford to, they can increase their pay and they can do, they can increase their benefits. They can be competitive because they're in private practice. That's not something that a public official can necessarily benefit from. Well, it's clear that public physicians in government facilities are entitled to qualified immunity. And therefore, I mean, how does that help you? I mean, the fact that they, that public officials, public physicians weren't eligible for qualified immunity. Well, we know they are now. And so why, why on this fact pattern, would Dr. Tuz be entitled to qualified immunity? And on that point, are you familiar with this fifth circuit case, Perniccio versus Lee? Well, I'm going to talk about that case and in particular, footnote nine, where the court talks about the Richardson and how Richardson interacts with And it seemed to me to be a persuasive cogent explanation for why this may be a situation where qualified immunity applies. And in particular, I want to focus on the question of working hand in hand with government officials and why should he be held to hold of that? Well, okay. The fifth circuit, to my knowledge, is the only circuit, first of all, that has gone in this direction for a private physician. And as we briefed, I think the sixth, seventh, ninth, and 11th circuits have gone the other direction and said, you don't get qualified immunity. But, but I believe that one of the big factors that the fifth circuit considered in the, in the case that you referred to is that, that the government there had a direct hand in supervising the actions of the medical provider at issue. And that's the same thing that, that the, that was persuasive to the district court in Tanner. It was this, this idea that the governmental agency or county or whatever it was at the time was directly overlooking or had oversight over what the doctor was doing. And so there was some accountability there. That's not what was happening, was happening here. Dr. Tubbs had no oversight. And we have Sheriff Boren's testimony that he had no medical expertise, that he relied exclusively on Dr. Tubbs to provide that, that he was allowed to create policies. And in fact, we know that through a course of dealing, they have, they were working on policies and have created some. And so- Well, if he relied exclusively on Dr. Tubbs, what does that tell you? It may tell you that Dr. Tubbs was performing an essential government function at that facility. And, and, you know, which, which allowed for, it said, this is the case we're not dealing with. We're not dealing with a case that involved a private individual briefly associated with a government body serving as an adjunct to government in an essential government activity or acting under closed supervision. And okay, fine. It's not dealing with those situations. Well, one of those situations as it ticked off, and this is what goes to footnote nine of the Fifth Circuit case, is a situation where you're providing a function that the government's going to provide one way or the other, and you are doing it hand in hand with government people. Why doesn't that, isn't that situation dramatically different than Richardson? I'm not sure that I agree with that court's analysis. I mean, I think that the, the way the Sixth Circuit defined the analysis falls more in line with what the Supreme Court did. And it's looking at, it's looking backwards and saying, what was, what kind of immunity was granted to this set of persons back at the time that the statute was enacted? And the bottom line is, is that, is that there wasn't any for private physicians. And so I think that's the factor that this circuit has treated that case as an outlier, I think, by virtue of the fact that it's still considering the question as to a private physician to be open. But, but there, I think the difference is that it involved an executioner, somebody who was coming in to perform specifically executions for the government, which not only historically, but I think by law can only be a public function. There are no private practice executioners. And so that was an easy call, I think, because that is a quintessential government function. But, but we can't say the same for providing medical services. That, that, that, that has arguably a much greater presence in this, in the purely private realm. And so I don't think it would be right to extend this doctrine to somebody who benefits, and in this case, has a lot of gigs at nine different prisons, and then somehow can be immunized from his actions. He can contract around that risk. His actions or his not, or non-actions. Correct. But in this situation, what I want to focus on is this whole question of linkage. I mean, he is bound to, to, to LPN Clyde, and she, he can't hire, he can't fire, he, as if you, if we have the world the way you like it, he's subject to liability because of what she did. Now, I mean, because if she, if there's no constitutional violation by Nurse Clyde, there's no, it's game over, right? For you. I agree. And I disagree. I would say it like this. If there has to be a constitutional violation by a subordinate, in this case, Nurse Clyde, for there to be liability for Dr. Tubbs in this particular case. Yeah. I explained in my last argument why I believe that Nurse Clyde violated Madison's constitutional rights. And so with that underpinning. But the point I make, the point I'm making is that, I'm sorry, go ahead. I didn't mean to cut you off. Finish your, finish your. Okay. So where I was going with that is, with that, established constitutional violation, we'll say, now we have to look at whether or not Dr. Tubbs failed to create policies or, or under, or put into place training that would help his subordinates know what to do. And that was what the district court was so hung up on. I mean, it was, we're talking about Keith versus Kerner. We're talking about a complete failure to train. Again, if we're given the benefit of the factual record here, we have Nurse Clyde saying, not a single person at the jail trained me on what to do in this circumstance or on any jail policy whatsoever. That's whether he's liable, I guess. And the, the reason I raised that issue of higher fire Nurse Clyde was on the antecedent question of whether he's entitled to qualified immunity. And on that question, the fact that he is linked to her, it suggests, would suggest he works hand in hand with her, would suggest that the rationale of Filarski would be at play and saying, why should we, he be held holding the bag when everybody around him, including the fact that he would be Why shouldn't he be subject to immunity too? Well, I think that one reason your honor is that he knew that going into the deal. I mean, he, as a private party, he has the privilege and benefit of, of contracting around these things. If he doesn't like that circumstance, he, he would be presumably in a position to say, I need my own nurse eyes on the ground. And so, and furthermore, I think under under the Dodds and the Keith cases, once he understood that Nurse Clyde is eyes on the ground, she's only an LPN, she can't diagnose or assess. So really there's nobody at the jail, six and a half days of the week who knows anything about medical treatment or anything to do with Yes. Well, she, she doesn't have training to assess or to diagnose. I understand, but does she have training as a condition of her licensure? Sure. She, and she even, and does that train that training include a topic on when to notify the attending physician? I would say no, because she didn't hear. And I mean, Nurse Clyde testified that she did come in. Isn't the answer, you don't know whether it does. I mean, because you haven't pleaded one way or another. Well, we did. We didn't plead that. No, we didn't plead it like that. We're, we're saying that Nurse Clyde did what she did. As I argued before, we're saying that as to Dr. Tubbs, he didn't train Nurse Clyde so that she knew when to call him. I thought Nurse Clyde test, testified in fact, in her deposition that if there were circumstances of dehydration, she knew to call. No, no, that's not what she said. She said I mean, when I drilled down on that in her deposition, she clarified that and she said, I didn't receive any training about that from anybody at the jail. And so yeah, yeah, she know to call if she had based upon the training she had previously had. No, she, she knew that she, she knew that she could call Dr. Tubbs or Logan Clark if she saw something that was concerning to her. But my point is, is that she was never told what should be concerning. And, and, and, and so, and, and, and it's illustrated as the district court pointed out by her utter inaction in the face of Madison's symptoms and self-reporting. I mean, she didn't even know, she wasn't even told to document her condition, to ask follow-up questions, to call the doctor when somebody is saying they can't eat or drink for four days. That, that evidence is that, that, that, that created an issue of fact in the district court's mind of an utter lack of training. And, and, and the evidence itself is that there were no policies in place other than call me if you're concerned. So that, that, that, that's not really a policy and required to have written policies in your opinion. Well, I think, well, there, the record is that there are no written policies. And so that's undisputed, but I'm not saying that the policies have to be written in order to, to give Dr. Tubbs something to be armed with here. There were no verbal policies either. Counselor, you know, if the evidence reflects that, that she knew she could call the doctor 24 seven and didn't. Right. Is that, who do you blame that on? The doctor? Yes. I, I, I would. So how did, so what do you want him to do? Sit down there with the LPN and just to correct the record, a licensed practical nurse can assess, they can't diagnose, but they can definitely assess and report. And I don't think there's any question about that. Well, the, the record in this case suggests otherwise. I mean, I think she testified, she can't assess or diagnose. And so I can't speak to the LPN. That's even worse. Yeah. Well, and sorry. Well, you're this argument in some sense argues against itself because one, and you know, in the prior argument, you're telling us that is deliberately indifferent because she's subjectively turned away from a risk. Now you're saying that because she lacked these policies, she wouldn't have known whether there was a concern or not. I mean, which one is it? I mean, it seems to me that in where I have a hard time seeing how the, if, if she knew she could have called at any moment, why that would have been not enough. Well, and let me just wrap up the, the, I think that on summary judgment, we're entitled to our claims against both people, because where there are issues of fact, it's the jury that has to decide which story they believe more. That's not a genuine issues. It's a material fact here. What's the fact? Well, right. But I'm, but, but I have an independent basis to claim liability. I think on the part of both of them at the same time, even if the theories are different. And to answer your last question, judge Holmes I think that the Jenkins versus Woody case is illustrative of this point. I think it sums it up well. And the district court sought this way too, that a jury could conclude that by not training deputies, or in this case, a nurse, proper observation to know when to report to medical staff, the supervisor made a constitutional violation, a highly predictable consequence. That's what happened here because they were given this carte blanche instruction, call whenever you want, but they didn't have any idea when to call as is evidenced by the record, because nobody called. There's a, there's a strong inference that there was no training. And that's exactly what Janet Clyde testified to no training, no policies. Thank you counsel. I think we understand your argument. You've got a minute and a half over. And I think I apologize. You've made your point. I think, no, no, apologize. Just, I think you've made your point. Thank you. But unless counsel, unless my colleagues have further questions. Thank you. And yes, you had almost a minute, a whole minute. Can you believe your honor? I wanted to start just briefly with the questions that Mr. Hansi asked Ms. Clyde and what she testified to during her deposition. Mr. Hansi, had you been taught prior to November of 2016, that if an inmate had been complaining of puking for over four days straight, runs, diarrhea, can't hold anything down, not even water, that you were to immediately call PA Logan or somebody from Dr. Tubbs office? Answer. If I had been made aware of this situation, that would have been what I have done. Yes. Question. Would you have done that because you were taught to do that or because it was made common sense to you? Both. Nurse Clyde had been taught that she should contact a physician in these circumstances. Now, plaintiff is arguing both that it is so obvious, but also that we need to provide training on these issues. Dr. Tubbs could rely upon Ms. Nurse Clyde's training as anticipated in Connick v. Thompson. Let me tell you my problem because I'm sympathetic to your argument and sympathetic to the view that everybody gets off on qualified immunity, but the poor country doc. But here's my concern. How do we write an opinion that protects this situation, but doesn't give blank and qualified immunity in every case that may come in the future? Little we know of it right now. Each case that has granted qualified immunity to private individuals is fairly narrowly tailored. And Donna, on the specific facts of the case, you can see that in Lockett, also in Richardson and in Filarski. They both take into account specific situations that are encountered in those cases. Specifically in Lockett, the Tenth Circuit Court indicated that we see no sense in depriving a private doctor the same protections of qualified immunity that would apply to employees that were provided. Okay, the clock is now running positive. When it gets to one and a half, then it's time for you to stop. But in the meantime, what are the unique circumstances of this case that entitled you to qualified immunity, whereas others might not? In this unique circumstance, Dr. Tubbs is an individually contracted doctor. Unlike Jensen B. Lane, he has no control over the hospital policies or admitting or discharge. He is not contracted to establish policies and procedures or to train any of the jail staff. He is, in fact, a physician that is there once a week. He's available 24-7. He abided by... Thank you very much. Also, I think I unless Judge Kelly or Judge Holmes. All right, hearing no further questions. Both of you did a very thorough job of arguing your cases. They stand submitted. You are excused.